UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

THE MILLGARD CORP.             :
                               :
            Plaintiff,         :         **OPINION**
    -v-                        :
                               :         99 Civ. 2952 (LBS)
E.E. CRUZ/NAB/FRONTIER-KEMPER, :
a joint venture, E.E. CRUZ & CO., :
NAB CONSTRUCTION CORP.,        :
FRONTIER KEMPER CONSTRUCTION,  :
INC. and AETNA CASUALTY        :
& SURETY CO.,                  :
                               :
            Defendants,        :
                               :
    -v-                        :
                               :
LIBERTY MUTUAL INSURANCE CO.,  :
                               :
            Counterclaim Defendant.  :
------------------------------------------------------------x

SAND, J.

Following the completion of liability issues in this complex and protracted suit for breach of a construction contract (See Millgard I - Millgard VI ) this Court held a damage hearing (Nov. 20-28, 2006) and in May 2007 the parties submitted their proposed findings of fact and conclusions of law. We assume familiarity with all of this Court's prior opinions and findings and address herein the disputed damage issues[1].

---

[1] Accordingly we do not repeat all of the Court's prior holdings or reasonings, nor the authorities on which the Court has relied. See Millgard Corp v. E.E. Cruz/Nab/Frontier-Kemper, 2006 WL 1699528 (S.D.N.Y.200_)(Millgard VI). Millgard Corp. v. E.E. Cruz/Nab/Frontier-Kemper, 2004 U.S. Dist. LEXIS 16882, 2004 WL 1900359 (S.D.N.Y. Aug. 24, 2004) ("Millgard V"); Millgard Corp. v. E.E. Cruz/Nab/Frontier-Kemper, 2004 U.S. Dist. LEXIS 12401, 2004 WL 1488534 (S.D.N.Y. July 2, 2004) ("Millgard IV"); Millgard Corp. v. E.E. Cruz/Nab/Fronier-Kemper, 2003 U.S. Dist. LEXIS 21287, 2003 WL 22801519 (S.D.N.Y. Nov 24, 2003) ("Millgard III"); Millgard Corp. v. E.E.Cruz/Nab/Fronier-Kemper, 2003 U.S. Dist. LEXIS 20928, 2003 WL 22741664 (S.D.N.Y. Nov 18, 2003) ("Millgard II"); Millgard Corp. v. E.E. Cruz/Nab/Frontier-Kemper, 2002 U.S. Dist. LEXIS 23921, 2002 WL 31812710 (S.D.N.Y. Dec. 12, 2002) ("Millgard I").

Mobilization (Millgard's Claim $525,000)

Although the Subcontract on which suit was based was not executed until December 10, 1997, it explicitly states that it is an agreement made "this 21st Day of August 1997." The delay in execution was occasioned by issues relating to bonding unrelated to the issues presently before the Court.

Millgard seeks recovery for the expenses it incurred for mobilization and takes the position that pursuant to Schedule A the Subcontract price of $12,337,000 specifically states that the total contract price of $12,337,000 had two distinct components: Excavation Support System (ESS $11,337,00 --; mobilizaton $1,000,000).

The Joint Venture takes the position that the contract was a single indivisible contract for $12,337,000 relying on precedents which hold that absent specific agreements to the contrary construction contracts are indivisible. Joint Venture also asserts that Millgard is not entitled to reimbursement for work performed prior to the contract date and that the parole evidence rule bars evidence as to any conversations or understandings reached prior to the execution of the contract.

We find that it was the clear understanding of the parties, as reflected in the language of the subcontract itself that $1,000,000 was to be paid to Millgard for mobilization. We also find that it is no defense that some mobilization costs were incurred before the subcontract was executed.

The Joint Venture was extremely anxious to move the project forward as expeditiously as possible and as this Court has previously found

> "Toward the end of July 1997, the JV directed TMC [i.e.
> "Millgard] to prepare to start construction ... To this end  TMC

>acquired and prepared equipment and brought cranes and attachments to the site.
>
>Millgard Corporation v. E.E. Cruz, et al.  2004 WL 148854 SDNY July 2, 2004.

Had Millgard completed performance of the entire contract it would of course have been entitled to a full recovery of mobilization costs.  It would be extremely inequitable to deny it recovery of these costs because they were performed at the Joint Venture's urging prior to the formal execution of the contract.  The Joint Venture was fully aware that Millgard was, at its request, beginning to mobilize and took no steps to discourage this from happening.  Inconsistently with its post-litigation position, the Joint Venture included in its requisitions to the City  work performed by Millgard prior to the formal execution of the contract.

The evidence also supports Millgard's claim that the mobilization costs at issue were attributable to the ESS and therefore within the subcontract and not for the GZA test program, the scope of which had not yet been finalized and was not included in the Subcontract.

The Joint Venture filed requisitions for work completed to the City including payments which it sought for transmission to Millgard.  (For example, the Joint Venture received $80,000 attributable to Millgard but withheld payment because of the dispute as to the total sum due Millgard).

We find that Millgard has sustained its burden of proof that it was entitled to receive $1,000,000 for its mobilization work which it had completed and has been paid $475,000.  It is therefore owed $525,000 for its completed work in mobilizing for this project.

Direct Costs (Claim for $561,428)

Millgard claims that it incurred direct costs for work performed pursuant to the

Subcontract prior to its termination in the amount of $561,428.  Millgard sought to prove this claim by detailed introduction of documents and the testimony of Christine Moretta, who was Millgard's chief financial officer at the relevant dates.  Joint Venture asserts that Millgard was overpaid for the work it completed and is entitled to no further payment.  Joint Venture also asserts that Millgard should be held to the figure attributed to work performed pursuant to the subcontract as set forth in Court Exhibit I at the liability trial on December 15, 2003.

At that time Millgard had stipulated to withdrawing its claim for its work on the test program and in Ex. I it set forth figures for the GZA test program, contract work and mobilization.  Thereafter, on Feb. 7, 2005 seeking to be relieved of this stipulation Millgard represented that it had conducted further discovery with respect to the facts set out in Ex. I; that Millgard did not have in its possession documents related to Ex. I (e.g. the O'Rourke documents - i.e., the Superintendents daily reports) and the Joint Venture daily reports.

Joint Venture asserts that the grounds Millgard asserts for relieving it from the Ex. I allocation of contract claims are inaccurate.  In fact, it appears that the allegedly unavailable documents were accessible to Millgard at the time Ex. I was presented and there has been no evidence that further formal discovery was conducted by Millgard.

Although the reasons initially asserted by Millgard for being relieved of Ex. I insofar as it attributes costs to the test program rather than the contract appear to have been inaccurate in some respects, we believe there are compelling reasons not to hold Millgard to be bound by Ex. I.

First and foremost Joint Venture does not assert that it has sustained any prejudice by virtue of Ex. I.  There is no allegation that Joint Venture relied on Ex. I in any way in

connection with the contract claim.

Further, it is true, as Millgard asserts, that the focus of Ex. I was on the quantum meruit claim and the test claim which were being withdrawn.

We do not take lightly the issue of relieving a party of its prior statements made during litigation. See <u>Perma Research & Development Company</u> v. <u>Singer Company</u>, 410 F.2d, 572, 577-78 (2d Cir. 1969) and <u>Palazzo</u> v. <u>Corio</u>, 232 F.3d. 39, 43 (2d Cir 2000) (a party witness cannot testify at trial in direct contradiction to deposition testimony without an adequate explanation for the contradictions). Nor do we accept as dispositive Millgard's assertion that this Court has the obligation to ascertain the true contract costs apart from any prior stipulations of the parties. Rather we conclude that under all of the circumstances of this case surrounding Ex. I, Millgard has adequately shown that Ex. I should not preclude it from proving actual direct contract costs. Millgard has attempted to do so. However, the Joint Venture has persuasively demonstrated that Millgard's alleged direct costs as presently asserted are grossly overstated. The Joint Venuture states that "[t]he difference between the total Flushing job cost shown in Court Exhibit "A" of $971,339.18 and the total job cost of $616,634 as shown per the Millgard financial statement (Exhibit "DHA - 14 and Exhibit "C") is $354,705.18, which are the costs that have been manufactured by Millgard after litigation commenced included in Court Exhibit "A", without explanation or justification." Defendants' Supplement to Findings of Fact #54, p.7.

The Joint Venture then proceeds to demonstrate in detail with accompanying exhibits the accuracy of the foregoing claim. Most significantly Millgard seeks to charge as a direct cost the purchase price of equipment the useful life of which extends beyond the anticipated life of the Flushing project. While the fair rental value of such equipment may be

charged as an expense, such purchases are capital improvements and were treated as such by Millgard pre-litigation.

Millgard includes as a direct cost for the Flushing project $39,181.68 paid to its expert/consultant, Buric (Exhibit 67). But the detailed Buric invoices reflect that the services tendered by Buric are not properly chargeable as direct costs to the Flushing project.

We need not detail all of the improper charges set forth by the Joint Venture (Defendants' Supplement to Finding of Fact #54, pp. 1-34) which run the gamut from major equipment charges to charges for beer and hotdogs at Yankee Stadium (p. 32). Suffice it to say we find that Court Exhibit A is unreliable and that Millgard's principal witness was unable to furnish a plausible reason for the $360,000 increase in Millgard's alleged direct costs. We disallow the direct cost claim as shown in Exhibit A and restrict Millgard's direct cost claims to those it initially stated.

*   *   *

Having dealt with Millgard's claims for damages relating to tangibles: mobilization costs and direct costs, we turn to its claims for overhead and lost profits.

### Millgard's claim Overhead ($700,000)

Millgard asserts a claim for overhead damage consisting of indirect costs (shop and field support) and SGA, (general and sales expenses, i.e. home office expenses (DH P. 102, I 14-19) which it has said were incurred for five months, July 1997 through Feb. 1998 (DH P. 445, L 18-22)

Millgard has shown what their home office overhead costs were during their work for Joint Venture but has not shown what they were before or after it was terminated from the

ESS. Any costs directly attributable to the ESS were charged under direct costs.

In short, Millgard has not proven that any conduct for which the Joint Venture is responsible increased its overhead expenses. Millgard's submissions of overhead expenses includes items which were not caused by or which are otherwise the responsibility of Joint Venture. For example: Millgard's claim for recovery of salary paid to Dennis Millgard after all work on the project was terminated is clearly without merit. See DH 565-563

Millgard's claim for overhead as a separate claim for damages is denied.

## Lost Profit on Contract Work
## Performed Prior to Termination

We have previously held that Millgard is entitled to lost profits on work performed under the contract prior to its actual termination. 2004 WL 1900359 SDNY Aug. 24, 2004, p. 5. Millgard would also be entitled to profits it would have earned had it not been terminated for cause, but had been terminated later for convenience due to impossibility. 2004 WL 1900359 SDNY, Aug. 24, 2004 p. 8.[2]

Millgard introduced evidence by Dennis Millgard and expert testimony of Michael Leary in support of the claim of entitlement to an award for profits equal to 62.57% of direct costs. Joint Venture asserted that Millgard had prepared estimates at various times of anticipated profits that were inconsistent with this claim but it is not clear when or for what purposes these were prepared. While plaintiff, in a breach of contract suit, has the burden of proof, he need only demonstrate the amount of damages with reasonable certainty and a wrongdoer has no right to insert upon a mathematically precise evaluation of damages suffered.

---

[2] In fact there has been no evidence that during this short period of time ("the gap" or "window") Millgard suffered any additional loss.

We find that Millgard has adequately established entitlement to damages equal to 65% of its direct costs actually incurred for work beyond mobilization.

Millgard's Claim for Anticipated<br>Profits for Unperformed Work

As we have noted, this Court has previously determined that Millgard is entitled to lost profits measured from the time of contract "up to the time when it would have been terminated for convenience due to the impossibility of that design." 2004 WL 1900359 SDNY, August 24, 2004, p. 9. Millgard contends that "its estimated costs, as long as they were reasonably estimated, less the agreed upon price, is the proper measure of lost profits". Millgard's Post-Damage Hearing Proposed Conclusions of Law, p. 38. It contends that the percentage-based anticipated profits of 62.57% should be applied to unperformed work in the absence of actual data since the work was never done. We agree as a general principle.

However, even reviewing as we must the issue of lost profits from the date of the contract rather than the date of the breach, one must recognize that significant uncertainties existed as to what would in fact be built in light of the GZA test program and the City's changing positions regarding the requirements for Wall 10.

We therefore find appealing and adopt Millgard's alternative proposal for calculating profits on a daily rate. Millgard's Post Damage Proposed Conclusions of Law, p.52.

Millgard proposes that this Court adopt the expert testimony it elicited from Michael Leary that a reasonable way to determine daily lost profits would be to take the anticipated percentage of profit (62.5%) and apply it to the anticipated daily direct costs ($71,000) (DH 6577, L18 - P5, L18.

Prior to contract Millgard expected production to last 100 days to start on

8

November 4, 1997 and the July 17, 1997 contract schedule (DH Exhibit 93) incorporated by reference into the Subcontract.

Millgard asserts: "The estimated daily profit is a simple calculation of taking the Subcontract percentage of profit (62.57%) and applying it to the daily anticipated direct costs of $71,000 (i.e. $7,100,000/100) to get $44,375/day of expected profit (DH P577, L18 - P578, L18). Pre-contract, TMC expected to get $44,375 in daily profits. TMC is entitled to those expected profits up until the time that the JOINT VENTURE would have terminated TMC for convenience due to the .5 inch deflection requirement. TMC asserts that that date is March 18, 1998, when the JOINT VENTURE contracted with Buric for an alternate ESS.

Joint Venture offered no expert testimony to refute this method of calculation. It has the virtue of recognizing the complexity and futility of any attempt to establish any supposedly precise calculation of anticipated profits. Although one can quarrel about the appropriate cutoff date, Millgard's selection of the date Joint Venture entered into a contract with another company (Buric) to construct an alternative ESS seems reasonable.

<u>Wall 10 Issue</u>

The City initially imposed a requirement that Wall 10, a major component of the ESS, be constructed so that there would be no more than a .5 inch deflection along Wall 10. This Court had based its initial conclusion that is was impossible to construct Wall 10 on its understanding that the City would adhere to this specification. However, the testimony of William Beloff was that in late December 1997, the City relaxed this deflection requirement and the Court corrected its earlier statement that construction of Wall 10 was impossible because of the .5 inch deflection requirement. Millgard contends that, but for its termination by the Joint

9

Venture, it would have built Wall 10 pursuant to the contract and is therefore entitled to recover the profits it would have received had it done so. This claim has not been included in Millgard's other claims.

Joint Venture directed GZA to prepare a preliminary design for a Wall 10 solution and on December 21, 1997, GZA issued a preliminary design for a simple column soil mix wall with tieback. Joint Venture asked Millgard to price out this Wall 10 design and Millgard initially bid $9,000,000 which, on December 27, 1997, it reduced to $8,519,000. It sent this bid to Joint Venture on Dec. 29, 1997 (DH Ex. 97). Millgard asserts this $8,519,000 bid included $3,500,000 in profit (DH P488, L18 - P489, L20). The City appears to have tentatively approved the GZA Wall 10 design but Joint Venture withdrew the design on Jan. 6, 1998, and orally terminated Millgard on Jan. 8, 1998. Millgard contends that it was entitled to construct a soil mix ESS and the Joint Venture was required to provide it with approved plans. Joint Venture therefore, Millgard claims, could only have pursued an alternate construction technique with another contractor if it terminated Millgard for convenience which Joint Venture declined to do. Millgard therefore asserts it is entitled to recover lost anticipated profits for the Wall 10 solution.

In opposing this claim Joint Venture asserts that the City specification D1.6.4(b) required that all walls be of the same type and that Millgard has not proved that Wall 10 could have been constructed as a soil mixed wall and the other ESS walls constructed as a Buric type wall. Further, the city representatives stated that before the start of any soil mixed columns Millgard would have to demonstrate the ability of soil mix to mix uniformly. Continuing with Millgard and a soil mix Wall 10 would therefore have confronted Joint Venture with further

10

delay and uncertainty. Switching to Buric obviously presented Joint Venture with an attractive and reasonable alternative. Although we have held that Joint Venture termination for cause was a breach of contract, we find that Joint Venture' decision to terminate Millgard by March 15, 1998 was understandable if not compelled under all the circumstances including time constraints and the need for City approval.

The soil mix Wall 10 would never have been built. Because it terminated Millgard for cause Joint Venture is liable to Millgard, but we find that Millgard had no contractual right to build Wall 10 and may not therefore recover profits it would have received had it done so. We need not therefore address Joint Venture's claim that Millgard has not proved that the alleged profits were reasonably foreseeable nor that it could have built Wall 10 within the existing time constraints.

### Consequential Damages

Millgard seeks to recover as its sole surviving claim for consequential damages[3] the amount of profit it would have received had it been able to obtain bonding for the Detroit River Project and would not have been required to share profits with another company (as it did) to satisfy the bonding requirement.

The issue, which has been the subject of reference in this Court's prior discussions relates to the fact that prior to termination for cause, Millgard urged that Joint

---

[3] At oral argument, counsel for Millgard suggested that the appropriate time for assessing the contemplation of the parties is the time of termination of the contract, in light of the unusual facts of this case. Counsel acknowledged that he had no citation available for such a position. (Oral Arg. Tr. 35, May 25,, 2006).

Venture terminate it for convenience[4] and avoid the adverse impact which termination for cause on a major construction project would likely have on its ability to obtain future bonding. Although this Court previously expressed skepticism about this claim it permitted Millgard to present its case on this issue.

Joint Venture asserts and we find that Millgard is unable to establish that the diminution in profits which it alleged it incurred on the Detroit River project is a compensable consequential damage suffered because it was terminated for cause rather than for convenience.

First, it is not at all clear that the refusal of Millgard's prior bonding company Liberty Mutual to bond Millgard was caused by the nature of Millgard's termination rather than subsequent events detailed at length in the Tretter affidavit on the Joint Venture Millgard VI motion.

But even if one were to assume that the nature of Millgard's termination was a factor in its inability to obtain future bonding, the significant time difference between Millgard's termination and the Detroit River project (five years) satisfies us that the alleged loss of profits on that project was not a reasonably foreseeable consequence of the events occurring five years earlier. Having been given full opportunity to prove a nexus sufficient to establish entitlement to consequential damages, we find it has failed to do so.[5]

## Conclusion

This Court having now ruled on the disputed damage issues Millgard is directed

---

[4] This request was, however, coupled with a monetary demand which Joint Venture obviously believed to be excessive.

[5] Accordingly, we need not address the Joint Venture's contention that entitlement to consequential damages was stricken from the contract at Millgard's request.

This Court having now ruled on the disputed damage issues Millgard is directed to submit within twenty (20) days from the date hereof a proposed order granting to it all monies (including interest) to which it is entitled pursuant to this Opinion. The Joint Venture may submit a proposed counter order within the next twenty (20) days.

SO ORDERED:

Dated: August __2-1,__ 2007
      New York, NY

_____
            U.S.D.J.